EDWARD C. KLAPP, Respondent, *v.* JULES S. BACHE and Others, Doing Business as Copartners under the Name and Style of J. S. BACHE & COMPANY, Appellants.*

Third Department, May 14, 1930.

*Fryer & Lewis* [*Charles G. Fryer* of counsel], for the appellants.

*W. Arthur Kline* [*George B. Smith* of counsel], for the respondent.

* Revg. 135 Misc. 508.

HINMAN, Acting P. J. The action is in conversion to recover damages against the appellants, doing business as stockbrokers, for the closing out of plaintiff's margin account upon allegations of insufficiency of notice to the respondent, as customer, to protect his account.

On the 8th of June, 1927, the respondent, who had previously been a customer of appellants and had dealt extensively with them and other stockbrokers as a purchaser on margin accounts, signed, executed and delivered to the appellants a " customer's agreement," which contained the following provision: " Upon failure of the undersigned to comply with any of the provisions hereof, or whenever deemed necessary for your protection, you are hereby authorized and empowered to sell, assign and deliver all or any part of the securities, commodities or contracts for commodities pledged hereunder upon any exchange or market or at any public or private sale at your option, and/or to purchase to cover short sales, and without demand for margin, and/or advertisement or notice of purchase or sale, which are expressly waived, *and no specific demand or notice shall invalidate this waiver* and after deducting all costs and expenses of purchase or of sale and delivery, including transfer and stamp taxes, to apply the residue of the proceeds to the payment of the liabilities of the undersigned to you, returning the surplus, if any, to the undersigned. * * * All notices or demands hereunder may be made by depositing the same in writing in the United States mail directed to the undersigned at the address given below."

From time to time during the following year the respondent customer made large purchases on margin account through the appellants, as his stockbrokers. The respondent resided in the city of Amsterdam, N. Y., and all of his business with the appellants was through their branch office in the city of Schenectady, N. Y., which is sixteen miles distant from Amsterdam. In early June, 1928, respondent's margin account, because of the state of the market, became inadequately protected and appellants claim that they tried unsuccessfully to reach respondent by telephone and that they left word at his home for him to call them. On June 8, 1928, having failed to hear from him, appellants claim to have mailed a margin call to respondent demanding that he forthwith deposit $10,000 with appellants to protect his margin account. They claim to have mailed a second demand or margin call to respondent on June 9, 1928. Respondent claims not to have received any of these communications. Having received no response, the appellants, on June 11, 1928, notified respondent by registered letter as follows: " In as much as you have ignored our previous calls for

additional margin we find it necessary to place stop loss orders for you on the securities you are carrying with us in order to protect ourselves. We are entering the following orders to sell: " (There followed a list of the securities and the prices at which sale was being ordered.) Respondent admits that he received this letter at five o'clock on June 12, 1928. On the afternoon of June 12, 1928, the appellants mailed to respondent another registered letter stating that they had sold three of the stocks pursuant to the stop loss orders and further stated: " With the depreciation in the values of your stocks today, we cannot carry your account unless we receive $10,000 from you. Unless we receive this money before 10 o'clock tomorrow morning we will sell your securities at the opening." On June 13, 1928, the respondent not having communicated with the appellants in response to either the letter of the eleventh or the twelfth, the remainder of respondent's securities were sold at the opening of the market and at the highest prices then obtainable. Respondent's equity in the securities, as evidenced by the then market value of his pledged collateral, was only a little over $2,000, or less than one and one-half points on each of the 1,500 shares of stock carried in his margin account.

Although respondent had received the letter of June eleventh, indicating to him the claim on the part of his brokers that he had ignored calls for additional margin and informing him of the proposed stop loss orders, respondent did not communicate with appellants until shortly after ten on the morning of the thirteenth, when he telephoned to appellants' office in Schenectady. He says he then asked to have the stop loss orders canceled, that he would be down with the money required. The person who answered said, " just a moment." She then informed him that it was too late, " the stocks were sold out this morning at the opening." He replied to her: " You have no right to do that. I said if I do not get that stock, I will make trouble for you." He did not, however, ask to talk to the office manager, and on June 19, 1928, he received from the appellants a check for $2,000, which he cashed. The amount due was in dispute and the appellants claim that this constituted a ratification of the sale even if the respondent was not bound by the terms of the " customer's agreement " providing that the broker could close out the customer's margin account without notice and irrespective of any specific notice given.

We need not consider the question of ratification because we think the respondent was bound by the express terms of the " customer's agreement." The trial court, relying apparently upon what was held in *Rosenthal* v. *Brown* (247 N. Y. 479) ruled that

the brokers were acting outside of the agreement when they placed these stop loss orders and notified respondent accordingly, and that having done so it was their duty to give him reasonable notice that such orders had been withdrawn before exercising their undoubted right to sell without notice under the agreement. We think the learned court did not give full effect to the agreement and also misapplied the holding in *Rosenthal* v. *Brown* (*supra*). In accordance with the terms of the agreement signed by the respondent, the appellants were authorized to sell the securities whenever deemed necessary for their protection, " without demand for margin " or notice of sale, " which are expressly waived, and no specific demand or notice shall invalidate this waiver." The notice to respondent of contemplated sale by stop loss orders was a specific notice of sale within the agreement. It merely described the specific method by which the sale was to be accomplished of the very things contemplated as the subject-matter of the agreement. The case of *Rosenthal* v. *Brown* (*supra*) is not in conflict with this view. There the agreement related solely to the sale of " securities " and the court held that it did not cover the sale of " cotton futures," an entirely different subject-matter. The respondent having expressly waived notice of sale and having expressly agreed that no specific notice of sale that might be given should invalidate this waiver, the appellants were entitled to rely upon the strict terms of the agreement and were not guilty of conversion when they sold the securities. " The doctrine of estoppel lies at the foundation of the law, as to waiver." ( *Underwood* v. *Farmers' Joint Stock Ins. Co.*, 57 N. Y. 500, 505; *Gearty* v. *Mayor, etc., of New York*, 171 id. 61, 72.) Judge PECKHAM in *New York Rubber Co.* v. *Rothery* (107 N. Y. 310, 316) held that to constitute estoppel " the person sought to be estopped must do some act or make some admission with an intention of influencing the conduct of another, or that he had reason to believe would influence his conduct, and which act or admission is inconsistent with the claim he proposes now to make. The other party, too, must have acted upon the strength of such admission or conduct. * * * In cases of silence there must be not only the right but the duty to speak before a failure so to do can estop the owner." In view of the contract between the parties the appellants had no reason to believe that the notice of stop loss orders would influence the conduct of the respondent, nor was there any duty to speak before proceeding under the strict terms of the agreement. Their act was not inconsistent with the claim they are now making. Neither did the respondent have any right to rely upon a waiver, because of his agreement that he would not do so.

The judgment and order should be reversed on the law and the facts, with costs, and the complaint dismissed, with costs.

DAVIS and WHITMYER, JJ., concur; HILL, J., dissents and votes for a reversal on the law and for a new trial unless plaintiff stipulates to reduce the judgment by crediting the $2,000 previously paid; if such stipulation is made, the judgment should be so modified and as modified the judgment and order should be affirmed, with costs; HASBROUCK, J., also dissents, with a memorandum.

HASBROUCK, J. (dissenting). The sale of the plaintiff's stocks on June twelfth under a stop-loss order instead of an absolute sale resulted in loss to the plaintiff in an amount not to exceed $700. I think the judgment should be reduced to that sum and as modified affirmed.

Judgment and order reversed on the law, with costs, and the complaint dismissed, with costs.